IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| LATASHA M. KELLY, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:13cv00070 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | By:    Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Latasha M. Kelly asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–422, 1381–1383f. This Court has authority to decide Kelly's case under 42 U.S.C. §§ 405(g) and 1383(c)(3), and her case is before me by referral under 28 U.S.C. § 636(b)(1)(B). On appeal, Kelly objects to the Commissioner's evaluation of her severe mental impairment and resulting functional limitations. *See generally* Pl. Br. 9–20, ECF No. 11. Having considered the administrative record, the parties' briefs, and the applicable law, I find that substantial evidence supports the Commissioner's final decision that Kelly is not disabled.

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

1

asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) (governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5)

2

whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Kelly protectively filed for DIB and SSI on January 21, 2011. *See* Administrative Record ("R.") 69, 73. She was 27 years old, *id.*, and had worked as a waitress, cashier, customer-service representative, and packer. *See* R. 203, 209. Kelly alleged disability due to blindness beginning January 1, 2009.[1] R. 208. The state agency denied her applications initially in May 2011, R. 72, 76, and upon reconsideration in August 2011, R. 86, 94. Kelly later submitted medical evidence suggesting that she also had a severe mental impairment. *See, e.g.*, R. 30, 36, 38, 300, 498, 507.

Kelly appeared with counsel at a hearing before an Administrative Law Judge ("ALJ") on August 16, 2012. R. 13, 34. She testified as to her alleged impairments and the limitations those impairments caused in her daily activities. R. 41–54. At the hearing, Kelly's attorney amended her alleged disability onset date to January 10, 2012, the date Kelly had her psychiatric intake assessment with Dr. William Trost, M.D. *See* R. 38.

In a written decision dated September 7, 2012, the ALJ concluded that Kelly was not entitled to disability benefits. R. 25. He found that Kelly's vision impairment and affective disorder were "severe," but that neither met or medically equaled an impairment listed in the Act's regulations. R. 16–17. The ALJ next determined that Kelly had the residual functional

---

[1] Kelly previously filed for DIB and SSI in October 2009, also alleging blindness beginning January 1, 2009. R. 58, 63. The state agency denied her applications in January 2010 because the reviewing physician determined that Kelly's "visual disturbance" was not a severe impairment. R. 60–61, 65–66. Kelly apparently did not ask the state agency to reconsider that decision before she filed the applications at issue in her current case. *See* R. 70, 74.

capacity ("RFC")[2] to "perform a full range of work at all exertional levels," as long as it was "simple, unskilled work" requiring only "occasional contact with the general public."[3] R. 17. The ALJ noted that this RFC ruled out Kelly's return to her past relevant work because those unidentified occupations were "not simple and unskilled." R. 23. Finally, the ALJ concluded that Kelly was not disabled because her "nonexertional limitations . . . [had] little or no effect on the [unskilled] occupational base at all exertional levels." R. 24. The Appeals Council declined to review that decision, R. 1, and this appeal followed.

### III. Discussion

Kelly's overarching objection is that substantial evidence does not support the ALJ's RFC determination. *See generally* Pl. Br. 9–20. She argues that the ALJ erred in evaluating opinions from Dr. Trost and another mental health professional, as well as her own credibility. *See id.* at 9–17, 17–19. Kelly also argues that the ALJ was not permitted to rely on the Medical-Vocational Guidelines ("the grids") to decide her case. *See id.* at 20–22. She asks the Court to reverse the Commissioner's decision and award benefits or to remand her case for further administrative proceedings. *Id.* at 22.

A.    *Medical-Source Opinions*

ALJs must weigh each "medical opinion" in the applicant's record. 20 C.F.R. §§ 404.1527(c), 416.927(c). Medical opinions are statements from "acceptable medical sources,"

---

[2] "RFC" is an applicant's maximum ability to work "on a regular and continuing basis" despite his or her impairments. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record and must reflect the "total limiting effects" of the applicant's impairments. 20 C.F.R. §§ 404.1545, 416.945.

[3] The ALJ also found that Kelly must "avoid concentrated exposure to hazards" because of her vision impairment. R. 17. Kelly's arguments on appeal are limited to the ALJ's analysis of her severe mental impairment and resulting functional limitations. *See generally* Pl. Br. 9–22. She does not challenge the ALJ's analysis of her vision impairment.

4

such as psychiatrists, that reflect judgments about the nature and severity of the applicant's impairment, including her symptoms, diagnosis and prognosis, functional limitations, and remaining capabilities.[4] 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical reviewers. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

A treating-source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "If not entitled to controlling weight, the value of the opinion must be weighed" in light of certain factors including the source's medical specialty, the source's familiarity with the applicant, the weight of the evidence supporting the opinion, and the opinion's consistency with other relevant evidence in the record. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam). The ALJ must consider the same factors when weighing medical opinions from non-treating sources, although such opinions are not entitled to any particular weight. *See* 20 C.F.R. §§ 404.1527(c), 404.1527(e)(2), 416.927(c), 416.927(e)(2).

The ALJ must explain the weight given to all medical opinions and must "give good reasons" for the weight assigned to any treating-source medical opinion. *See id.* If the ALJ's RFC assessment conflicts with a medical opinion, he also must explain why that opinion was not adopted in full. *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D.

---

[4] Medical opinions are distinct from medical-source opinions on issues reserved to the Commissioner, such as whether the applicant is "disabled." 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Although the ALJ must consider a physician's legal conclusions as he would any relevant evidence, *Morgan v. Barnhart*, 142 F. App'x 716, 722 (4th Cir. 2005), but he need not give it "any special significance." 20 C.F.R. §§ 404.1527(d), 416.927(d).

5

Va. Feb. 10, 2014) (citing SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996)). His decision must be sufficiently specific to make clear to subsequent reviewers the weight he gave to the opinion(s) and the reasons for that weight. *Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013).

Non-acceptable medical sources, such as counselors, cannot give "medical opinions" about the applicant's condition. *See Ward v. Chater*, 924 F. Supp. 53, 56 (W.D. Va. 1996); 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). But they can provide valuable information about the applicant's medical condition and functional limitations. *See Adkins v. Colvin*, No. 4:13cv24, 2014 WL 3734331, at *3 (W.D. Va. July 28, 2014) (Kiser, J.). The ALJ may consider their opinions as he would opinions from acceptable medical sources, and he should do so when the source "had a lengthy relationship with the claimant." *Id.* at *3 n.6. But non-acceptable medical sources are not "treating" sources, and their opinions are never entitled to any particular weight. *See id.* at *3; 20 C.F.R. §§ 404.1527, 416.927.

1.    *The Medical Evidence and Opinions*

Kelly first complained of "depressive and anxiety symptoms" in January 2012, one year after she applied for disability benefits. *Compare* R. 376 (Jan. 2012), *with* R. 382–83 (Oct. 2011); R. 453, 457 (Mar. 2011); R. 69 (Jan. 2011); R. 246–47 (undated). Danville-Pittsylvania Community Services referred Kelly to Dr. Trost "for medication management due to some complaints of depressive and anxiety symptoms." R. 376. During their intake session on January 10, 2012, Dr. Trost observed that Kelly's "attitude [was] appropriate, pleasant, and cooperative." R. 377–78. Kelly "report[ed] having some trouble trusting people," but Dr. Trost opined that the problem did not "materialize to outright paranoia." R. 378. A mental-status exam was normal except for Kelly's "constricted" affect, "dysthymic" mood, and "general restlessness." R. 377.

Kelly's insight and "judgment appear[ed] to be intact" and she "track[ed] the conversation" throughout their hour-long meeting. R. 378.

Dr. Trost diagnosed "Generalized Anxiety Disorder versus Panic Disorder," cannabis abuse, and moderate recurrent Major Depressive Disorder. R. 378. He prescribed 50 mg Zoloft and 10 mg Ambien and instructed Kelly to return to the clinic in six weeks. *Id.* Kelly returned for a follow-up visit with Nurse Karen Jones, F.N.P., on March 15, 2012. R. 375. She reported that she was sleeping better, but that her "mood continue[d] to fluctuate." *Id.* Kelly had been "off her medications for several weeks" after "running out of" or "misplac[ing] them." *Id.* She asked Nurse Jones to increase her Zoloft because she "felt better" on the medication. *Id.*

Nurse Jones observed that Kelly's mental-status exam was normal except for her "constricted" affect and "slightly dysthymic" mood. *Id.* Kelly's "memory and attention[] span" were normal, her speech was spontaneous, "soft, relevant, and coherent," her judgment and insight were "intact," and her "attitude [was] appropriate, pleasant, and cooperative." *Id.* Nurse Jones opined that Kelly's noncompliance with her medications "probably" explained why she "present[ed] with only partial improvement in symptoms" on this visit. *Id.* She increased Kelly's Zoloft from 50 mg to 100 mg once daily and instructed her to return in six weeks. *See id.*

Kelly next saw Dr. Trost on July 20, 2012. R. 519. She "report[ed] ongoing affective lability and depression," irritability, mood swings, "severely impaired concentration," social withdrawal, and low motivation, among other significant psychiatric symptoms. *Id.* Kelly had again been off Zoloft and Ambien for "about a month" after running out of the medications. *Id.* A mental-status exam was within normal limits except for Kelly's "constricted" affect, "depressed" mood, and "arguabl[y]" slowed psychomotor/behavior. *Id.* Her insight and judgment

7

were intact, her speech was "clear, measured, and relevant," and she was alert and oriented throughout the twenty-minute visit. *Id.*

Dr. Trost observed that Kelly "appear[ed] to be quite depressed" and did not "appear to be in any condition to work today." *Id.* He now was "leaning toward changing her primary diagnosis to bipolar disorder given the cyclicity [Kelly] describe[d] in regard to her moods today." *Id.* He also noted that he was "becoming more convinced that her mental illness is, in fact, disabling." *Id.* Dr. Trost instructed Kelly to discontinue Zoloft, start "a trial of [L]amictal for mood stabilization and possible antidepressant effects," and return to the clinic in eight weeks. R. 519–20. Dr. Trost did not see Kelly again before he completed his residual function questionnaire.

Dr. Trost completed a Psychiatric/Psychological Impairment Questionnaire on July 27, 2012. He diagnosed Kelly with "Bipolar Disorder Not Otherwise Specified versus Bipolar II."[5]

---

[5] Dr. Trost also included a DSM-IV Multiaxial Evaluation documenting the following disorders, conditions, and level of functioning:

| Axis I: | Bipolar Disorder, Type II; |
|---|---|
| Axis II: | Personality Disorder Not Otherwise Specified with Borderline Traits; |
| Axis III: | History of seizure disorder, legally blind secondary to keratoconus; |
| Axis IV: | Relationship stressors, unemployed, financial stressors; |
| Axis V (current GAF): 40; | |
| Lowest GAF past year: 35. | |

R. 508. A multiaxial evaluation "involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 27 (4th ed. 2000) (*DSM-IV*). The assessment "facilitates comprehensive and systematic evaluation" with attention to clinical and personality disorders (Axes I & II), general medical conditions (Axis III), psychological and environmental problems (Axis IV), and level of functioning (Axis V) "that might be overlooked if the focus were on assessing a single presenting problem." *Id.*

"GAF" stands for Global Assessment of Functioning. *See id.* at 32. GAF scores represent a "clinician's judgment of the individual's overall level of functioning." *Id.* The scale is divided into 10 ten-point ranges reflecting different levels of functioning, with 1–10 being the least functional and 91–100 being the most functional. *See id.* A score of 30–40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or

8

R. 508. Dr. Trost identified fifteen clinical findings supporting this diagnosis, including poor memory, emotional lability, difficulty thinking or concentrating, hostility and irritability, and social withdrawal or isolation. *See* R. 509. He also explained that Kelly had "severe impairments in [the] interpersonal sphere due to mood lability and impulsivity." *Id.* Dr. Trost noted that he had examined Kelly bimonthly since January 10, 2012, but had seen "minimal improvement, if any, over [the] past 7 months." *Id.* Kelly's prognosis was "poor" despite taking Zoloft and Ambien with "minimal" side effects. R. 508, 513.

Dr. Trost filled out a check-box form listing Kelly's specific work-related limitations from January 1, 2012, through at least January 1, 2013. *See* R. 511–13, 514, 515. He opined that Kelly was "markedly limited"[6] in her ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual; (3) sustain an ordinary routine without supervision; (4) work with or around others without getting distracted; (5) complete a normal workweek without interruptions from psychological symptoms; (6) perform at a consistent pace without unreasonable breaks; and (7) interact appropriately with the general public. *See* R. 511–12. Dr. Trost noted that Kelly's psychiatric symptoms included significant "concentration problems," although these problems were less "frequent and/or severe" than her "affective lability [and] irritability." R. 510.

Dr. Trost also opined that Kelly was "moderately limited"[7] in her ability to: (1) remember locations and work-like procedures; (2) understand, remember, and execute detailed

---

irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed [person] avoids friends, neglects family, and is unable to work . . . .)." *Id.* at 34.

[6] "Markedly limited" means that the limitation "effectively precludes the individual from performing the activity in a meaningful manner." R. 510.

[7] "Moderately limited" means that the limitation "significantly affects but does not totally preclude the individual's ability to perform the activity." R. 510.

9

instructions; (3) accept instructions from and respond appropriately to criticism from supervisors; (4) get along with coworkers; (5) maintain socially appropriate behavior and hygiene; (6) respond appropriately to changes in the work setting; and (7) make plans independently. *See* R. 511–13. Finally, Dr. Trost opined that Kelly was "mildly limited"[8] in her ability to: (1) understand, remember, and execute one-step or two-step instructions; (2) make simple work-related decisions; and (3) ask simple questions or request assistance. *See id.*

Dr. Trost also opined that Kelly was "incapable of even low stress" work because "she appears . . . unable to deal with the stresses of staying home despite having a supportive husband." R. 514. He noted that Kelly had good days and bad days and that she would miss more than three days of work each month due to her impairments or treatment. R. 514–15. Dr. Trost added in conclusion, "[Kelly's] affective lability and irritability are severe enough to be disabling, and have proven refractory to treatment. I feel she is completely and permanently disabled." R. 515.

Manda Arnold, Q.M.H.P., provided support services for Kelly from May to August 2012. *See generally* R. 522–61.She completed a Psychiatric/Psychological Impairment Questionnaire on July 10, 2012.[9] *See* R. 499–506. Ms. Arnold noted that she examined Kelly one time for a full day on May 4, 2012. *See* R. 499. She diagnosed Kelly with Bipolar and Intermittent Explosive

---

[8] "Mildly limited" means that the limitation "does not significantly affect the individual's ability to perform the activity." R. 510.

[9] "Q.M.H.P." likely stands for "Qualified Mental Health Professional." *See* 12 Va. Admin. Code § 30-50-226(A). The postnominal abbreviation identifies "a clinician in the human services field who is trained and experienced in providing psychiatric or mental health services to individuals who have a psychiatric diagnosis." *Id.* Ms. Arnold's questionnaire also was signed by Nephetia Whittaker, M.A., L.M.H.P-E. *See* R. 506. The postnominal abbreviation "L.M.H.P." likely identifies a person who is "licensed in Virginia as a physician, a clinical psychologist, a professional counselor, a clinical social worker, or a psychiatric clinical nurse specialist." 12 Va. Admin. Code § 30-50-226(A). Ms. Arnold and Ms. Whittaker provided Kelly with counseling and life-skills training in May, June, and July 2012. *See* R. 536, 538, 549–56.

Disorders.[10] Ms. Arnold identified two dozen clinical findings supporting these diagnoses, including all but one of the fifteen clinical findings that Dr. Trost later identified in his questionnaire. *Compare* R. 500, *with* R. 509. She added to the list findings including "paranoia or inappropriate suspiciousness" and "illogical thinking or loosening of associations." R. 500. She omitted "hostility and irritability." *Compare* R. 500, *with* R. 509.

Ms. Arnold also opined that Kelly was "markedly limited" in each of the functional areas listed in the questionnaire completed by Dr. Trost, except: (1) remembering locations and work-like procedures; (2) sustaining an ordinary routine without supervision; (3) making simple work-related decisions; (4) interacting appropriately with the general public; (5) asking simple questions or requesting assistance; and (6) setting realistic goals and making plans. R. 502–04. Ms. Arnold opined that Kelly was only "moderately limited" in these areas. She also explained that Kelly "tends to isolate herself" from stressful situations, "does not adapt to change," avoids new people and experiences, and is "paranoid regarding her treatment team." R. 504.

2.   *The ALJ's Findings*

The ALJ considered Dr. Trost's and Ms. Arnold's opinions in forming Kelly's RFC. *See* R. 20–21, 23. He rejected Dr. Trost's opinion that Kelly was totally disabled because that is an

---

[10] Ms. Arnold also included a DSM-IV Multiaxial Evaluation documenting the following disorders, conditions, and level of functioning:

| | |
|---|---|
| Axis I: | Bipolar & Intermittent Explosive disorders; |
| Axis II: | 799.9; |
| Axis III: | Back pain and visual impairment; |
| Axis IV: | Money management, socialization, relationship building; |
| Axis V (current GAF): 44; | |
| Lowest GAF past year: [blank]. | |

*See* R. 499. A GAF score of 44 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social occupational, or social functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 34. The code "799.9" on Axis II (personality disorders) indicates that the "diagnosis [was] deferred[] pending the gathering of additional information." *Id.* at 28–29.

issue reserved to the Commissioner. R. 23. The ALJ also rejected most of Dr. Trost's specific restrictions. *Compare* R. 16–17, *with* R. 511–14. The ALJ explained that Dr. Trost's functional assessment was not supported by the longitudinal record documenting "limited findings" and "generally routine and conservative treatment." *Id.* He also explained that Dr. Trost's opinions conflicted with his own clinic's treatment notes and Kelly's noncompliance with prescribed medications. *See* R. 16, 23.

The ALJ found that Kelly could perform "simple, unskilled work" requiring only "occasional" interaction with the general public. R. 17. Unskilled work "is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). Competitive, remunerative, unskilled work demands the ability, on a sustained basis, to understand, remember, and execute simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. *See* SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985). The ALJ found that Kelly could engage in each of these activities on a sustained basis. R. 17.

The ALJ also rejected Ms. Arnold's opinions. R. 23. He explained that Ms. Arnold was not an acceptable medical source and that she had not performed any mental-status exams during her time with Kelly. *See id.* Additionally, Ms. Arnold's opinions conflicted with progress notes that she and her colleagues made, showing that Kelly "reported generally doing well and being upbeat throughout treatment[] and did not report significant symptoms of depression and mania until she brought disability paperwork to be completed in July 2012." *Id.*

*3.    Analysis*

Kelly argues that the ALJ did not consider the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c) when evaluating Dr. Trost's and Ms. Arnold's opinions. *See* Pl. Br. 14–16. She also argues that Dr. Trost's medical opinions deserve controlling weight under the regulations. *See* Pl. Br. 14. These arguments are without merit.

The ALJ acknowledged that Dr. Trost is a psychiatrist who evaluated Kelly two times in seven months before giving his opinion.[11] *See* R. 19, 21, 22; 20 C.F.R. § 404.1527(c)(1), (2), (5); 20 C.F.R. § 416.927(c)(1), (2), (5). He also considered the weight of the evidence supporting Dr. Trost's opinions and the opinions' consistency with the full record. *See* R. 16, 19–23; 20 C.F.R. §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4). As to Ms. Arnold, the ALJ considered her professional qualifications, the length and nature of her relationship with Kelly, the weight of the evidence supporting her opinions, and the opinions' consistency with other evidence in the record. *See* R. 20, 23; 20 C.F.R. §§ 404.1527(c)(1)–(5), 416.927(c)(1)–(5). Thus, the ALJ applied the correct legal standards in evaluating Dr. Trost's and Ms. Arnold's opinions. *See*

---

[11] The ALJ did not say whether he considered Dr. Trost to be a "treating" source whose medical opinions might be entitled to controlling weight. *See* R. 23. Treating sources are acceptable medical professionals who are "most able to provide a detailed, longitudinal picture of [the applicant's] medical impairments" and who "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Whether a doctor is a treating source is a question of fact. *See, e.g.*, *Arrington v. Colvin*, No. 4:13cv11, slip op. at 9, 14 (W.D. Va. May 21, 2014) (Hoppe, M.J.) (questioning whether substantial evidence supported ALJ's finding that a psychiatrist who examined plaintiff four times in four months was not a treating source), *adopted by* 2014 WL 2586237, at *1 (June 10, 2014) (Kiser, J.); *Partlow v. Astrue*, No. 2:09cv474, 2011 WL 320955, at *4 n.7 (E.D. Va. Jan. 28, 2011) (rejecting plaintiff's argument that "a treating physician is a treating physician on his first visit as well as his three hundredth"). The ALJ's failure to make this finding on the record, if error, was harmless because he clearly concluded that Dr. Trost's opinions were inconsistent with other evidence in the record or not well-supported by the medical evidence. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam).

13

*Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam) (acceptable medical source); *Adkins*, 2014 WL 3734331, at *3 (non-acceptable medical source). The remaining question is whether his reasons for rejecting those opinions are supported by substantial evidence.

The ALJ found that Dr. Trost's work-preclusive restrictions were inconsistent with his own clinic's treatment notes, the "limited findings" on mental-status exams, and Kelly's "generally routine and conservative treatment." R. 16, 23. These are "specific and legitimate reasons" for rejecting even a treating source's opinion. *Bishop*, 583 F. App'x at 67 (substantial evidence supported ALJ's decision to reject treating physician's opinion "in its entirety" where the opinion was "inconsistent with the mild to moderate diagnostic findings, the conservative nature of Bishop's treatment, and the generally normal findings during physical examinations").

Substantial evidence supports the ALJ's finding that Dr. Trost's clinic notes do not support his work-preclusive restrictions. All three records document Dr. Trost's and Nurse Jones's observations that Kelly's mental-status exams were within normal limits except for her "constricted" affect and "dysthymic" or "depressed" mood. R. 375, 377–78, 519. Both providers observed that Kelly's "attitude [was] appropriate, pleasant, and cooperative" even when Kelly was not taking her prescribed medication. R. 375, 377–78. Neither questioned her ability to concentrate, remember things, make decisions, accept instructions or criticism, interact appropriately with others, regulate her behavior, or deal with changes in routine settings. *Compare* R. 375, 377–78, *with* R. 509–15.

Dr. Trost's July treatment notes document Kelly's own report that her psychiatric symptoms deteriorated after again going without Zoloft and Ambien for several weeks. R. 519. But they do not contain any objective observations, as opposed to a recitation of Kelly's report of

14

symptoms, that might support Dr. Trost's specific work-preclusive restrictions. *Compare* R. 519, *with* R. 511–13. On the contrary, Dr. Trost noted essentially the same findings on Kelly's mental-status exam in July as he and Nurse Jones noted in January and March. *Compare* R. 519, *with* R. 375, 377–78. Further, Dr. Trost's July notes suggest that his specific restrictions are based largely on Kelly's description of her symptoms during the twenty-minute visit, as well her new report that she last worked "in 2010 and was fired due to irritability."[12] *Compare* R. 519, *with* R. 511–13. The ALJ may reject a physician's opinion that mirrors the patient's complaints, but conflicts with the physician's contemporaneous treatment notes. *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

Substantial evidence also supports the ALJ's finding that Dr. Trost's work-preclusive restrictions were inconsistent with "limited findings" elsewhere in Kelly's mental health records. R. 23. Kelly regularly received counseling and life-skills training through Support Systems, LLC, between May and August 2012. *See generally* R. 522–61. On May 4, a clinician noted that Kelly's "four basic needs [were] maintaining her physical health, mental health, increasing her socialization, and increasing her independent living skills." R. 560–61. Early progress notes suggest that Kelly struggled to interact appropriately with others. *See, e.g.*, R. 554, 551, 553, 554, 558, 559. By mid-July, however, several clinicians noted consistent improvement in Kelly's interpersonal and communication skills. *See, e.g.*, R. 531, 532, 533, 534, 537. They observed that

---

[12] Kelly has also said that she stopped working: (1) in December 2009 because she could not see the computer screen, R. 49; (2) in July 2009 because she found out she was pregnant, R. 208; (3) in December 2010 because she could not see properly, R. 233, 254; and (4) in 2011 after completing "seasonal work," R. 382. When she applied for disability benefits, Kelly reported that she got along "very well" with authority figures and had never "been fired or laid off from a job because of problems getting along with other people." R. 247.

15

Kelly was "in a good mood,"[13] "receptive to services," actively participated in individual and group counseling sessions, and appropriately interacted with those around her. *See, e.g.*, R. 522, 523, 524, 525, 526, 527, 529, 531.

The ALJ also cited Kelly's conservative treatment and non-compliance with treatment as reasons to question Dr. Trost's restrictions. R. 23. At their initial visit, Dr. Trost prescribed Kelly Ambien and Zoloft to address her depression, anxiety, and sleep problems. R. 378. Over the next six months, Kelly saw Dr. Trost and a nurse in his practice once each. At these follow-up visits, Kelly advised that she had stopped taking her medications, either because she ran out or lost them. Nurse Jones increased Kelly's dosage of Zoloft, and later Dr. Trost switched Kelly to Lamictal. While there is "no bright-line rule [for] what constitutes 'conservative' versus 'radical' treatment," *Gill v. Astrue*, No. 3:11cv85-HEH, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012), an unexplained inconsistency between a physician's characterization of his patient's condition and the treatment he prescribes for that condition can weigh against the physician's opinion. *See Bishop*, 583 F. App'x at 67; 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6). Considering Kelly's medication management and the infrequency of her doctor's visits, the ALJ reasonably determined that her treatment was conservative and inconsistent with Dr. Trost's characterization of Kelly's mental impairment and functional limitations.

Kelly does not point to any specific evidence in her record that arguably entitles Dr. Trost's opinions to more weight. *See* Pl. Br. 14–15. She simply disagrees with the ALJ's choice between conflicting medical evidence. This Court cannot second-guess that choice where, as here, the ALJ gave "specific and legitimate reasons," supported by substantial evidence in the record, for discrediting a doctor's opinions. *Bishop*, 583 F. App'x at 67. Given the persuasive

---

[13] Noted exceptions tend to correspond with traumatic events, such as a serious car accident in June and a close friend's death in August. *See, e.g.*, R. 523, 547–50.

evidence discussed above, I find no error with the ALJ's decision to reject Dr. Trost's work-preclusive restrictions.[14] *See Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *3–4 (W.D. Va. Sept. 12, 2014) (Kiser, J.) ("Plaintiff's medical records conflict with Dr. Trost's opinions, and thus it was the ALJ's role to weigh the evidence to determine which evidence was more persuasive. Unfortunately for Plaintiff, the ALJ sided—fairly and consistently with the law—against Dr. Trost.").

The same evidence supports the ALJ's finding that Ms. Arnold's nearly identical functional assessment was not supported by the longitudinal record. *See* R. 23. Kelly primarily objects to the ALJ's suggestion that Ms. Arnold's work-preclusive restrictions deserve less weight because the Support System counseling notes do not document specific clinical or mental-status findings. *See* Pl. Br. 15. Ms. Arnold's failure to marshal objective medical evidence supporting or otherwise explaining her work-preclusive restrictions is a legitimate reason to discount her opinions. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Further, it is reasonable to expect that mental health professionals, like Ms. Arnold and her colleagues, would document behaviors like "paranoia regarding treatment and other services," R. 500. *Cf. Chestnut v. Colvin*, No. 4:13cv8, 2014 WL 2967914, at *3 (W.D. Va. June 30, 2014) (Kiser, J.) (acknowledging that some medical events may go undocumented, but finding it "reasonable to expect" that a patient will accurately report symptoms to her providers).

Kelly's record contains forty pages of Support System progress notes dated between May and August 2012. *See* R. 521. None contains any indication that she resisted mental health

---

[14] Like Dr. Trost's and Ms. Arnold's opinions about Kelly's functional capacity, their GAF scores indicating Kelly suffered from major impairments and serious symptoms, R. 378, 499, 520, are inconsistent with their treatment notes. As such they do not undermine the ALJ's rationale. *See Cooke v. Colvin*, 4:13cv18, 2014 WL 4567473, at *3 (W.D. Va. Sept. 12, 2014) (Kiser, J.).

services. Indeed, all but a handful document that Kelly had the exact opposite response. *See, e.g.*, R. 522–26, 530, 535 ("Client was receptive to services."); R. 528 ("Client was well prepared for her appointment."); R. 531 ("Client responded positively to skills training today."); R. 536 ("Client is satisfied with every aspect of her mental health support services except being assigned a new clinician."); R. 537 ("Client was motivated and ready for services today."); R. 539–45 (noting Kelly was "in good spirits," "upbeat," or "excited" and "ready for services"); R. 557–58 ("Client is motivated to treatment and engages with the clinician in treatment."). The significant inconsistencies between Ms. Arnold's opinion and the Support System progress notes support the ALJ's decision to reject her opinion. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

B.    *Kelly's Credibility*

Kelly next argues that the ALJ erred in evaluating her credibility. The Fourth Circuit recently reminded reviewing courts that they should defer to an ALJ's credibility finding absent "exceptional circumstances." *Bishop*, 583 F. App'x at 68 (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011. In *Bishop*, the Fourth Circuit found that substantial evidence supported the ALJ's adverse credibility determination because he applied the correct legal standard, "cited specific contradictory evidence[,] and averred that the entire record had been reviewed." 583 F. App'x at 68.

Kelly's case is not one of exceptional circumstances. The ALJ first summarized Kelly's statements describing her psychiatric symptoms and functional limitations, R. 16, 18–19. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). He then reviewed each available mental health record from the relevant period, R. 18–21. 20 C.F.R. §§ 404.1529(c)(2)–(3), 416.929(c)(2)–(3). The

18

ALJ also weighed opinions from Dr. Trost and Ms. Arnold, both of whom personally observed Kelly's mental state during that time, R. 23. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

After reviewing this evidence, the ALJ found that Kelly's affective disorder "could reasonably be expected to cause some of [her] alleged symptoms[,]" but that her statements describing the intensity, persistence, and limiting effects of those symptoms were "not credible" to the extent that they were inconsistent with the ALJ's RFC determination. R. 17, 21–22. The ALJ "provided a comprehensive list of reasons," with supporting references to the record, for discrediting Kelly's claim that she cannot work at all. *Cooke*, 2014 WL 4567473, at *4 (finding no legal error where the ALJ did the same).[15]

The ALJ found that Kelly's daily activities were "not limited to the extent one would expect," R. 22, given Kelly's allegation that she has "no concentration" and does not "know how to . . . interact with [people] on a daily basis," R. 53–54. In support, the ALJ cited Kelly's description of her daily activities around the time she applied for benefits in January 2011. *See* R. 22 (citing R. 241–47). At the time, Kelly reported taking care of her children, making simple meals, shopping, and going to church. *See* R. 241–47. This evidence arguably lost some probative value once Kelly amended her alleged onset date to January 2012. Still, it is consistent with Support System progress notes from summer 2012 showing that Kelly took care of her children, went to the food bank, drove independently, actively participated in life-skills training sessions, and attended group meetings and monthly socials. *See generally* R. 522–51. In August

---

[15] Kelly states that the ALJ did not "adequately consider" her testimony "against an accurate representation of the record." Pl. Br. 20. She does not explain this statement or point to any evidence that the ALJ ignored, overlooked, or misconstrued.

2012, Kelly testified that she went out into the community with her Support Systems clinician "three or four times a week." R. 46–47.

Kelly portrays these daily activities as sporadic. Pl. Br. 19. This assertion ignores the considerable task that Kelly undertakes daily with her husband of raising three young children. On a daily basis, Kelly gets one child ready for school, then "tend[s]" to the others until her oldest returns home. R. 241. Moreover, her activities show that she was able to interact with others. *See generally* R. 522–51. Her child-rearing combined with other more modest activities provide support for the ALJ's credibility determination.

The ALJ's other reasons for discounting Kelly's testimony also are supported by substantial evidence in the record. The ALJ cited Kelly's inconsistent statements about whether she took her medication as prescribed during the relevant period. R. 22. Kelly testified that she took her medications "every single day" between January 10, 2012, and August 16, 2012, except for the "short" time that she discontinued Ambien to care for her infant daughter. R. 44. In March 2012, however, Kelly told Nurse Jones that she had gone without Zoloft and Ambien "for several weeks" because she ran out of or misplaced those medications. R. 375. Kelly also told Dr. Trost in July 2012 that she ran out of both medications "about a month" earlier. R. 519.

Courts have long allowed parties to use a witness's prior inconsistent statements to impeach his or her testimony. *Campbell v. Comm'r of Soc. Sec.*, No. 4:13cv50, slip op. at 24 (W.D. Va. Nov. 20, 2014) (Hoppe, M.J.), *adopted by* 2014 WL 7011116, at *1 (Dec. 11, 2014) (Kiser, J.); *cf. United States v. Hale*, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness."). Kelly claims that she suffers debilitating psychiatric symptoms even though she takes her medications as prescribed. *See, e.g.*, R. 43–44, 47, 519. It was not unreasonable for the ALJ to

conclude that Kelly's inconsistent statements about her noncompliance undermined her credibility. *See Sowers v. Colvin*, No. 4:12cv29, 2013 WL 3879682, at *4 (W.D. Va. July 26, 2013) (Kiser, J.) (claimant's inconsistent statements about his level of pain provided substantial support for ALJ's adverse credibility finding).

The ALJ correctly found that Kelly did not take her medications as prescribed. Kelly argues that the ALJ did not consider evidence that she is "paranoid" about taking medications and "obtaining regular treatment," Pl. Br. 12, before drawing negative inferences about her credibility. The ALJ reasonably rejected Ms. Arnold's comment to that effect because it was inconsistent with progress notes documenting that Kelly was "receptive to" and actively engaged in her mental health treatment. *See* R. 23. Kelly also twice blamed her noncompliance on "running out" of Zoloft and Ambien several weeks before her clinic appointments. R. 375, 519. There is no indication that she tried to refill these medications even though they made her feel better. *See* R. 52, 375.

Additionally, the ALJ found that Kelly's "generally routine and conservative treatment" and noncompliance with that treatment "suggest[ed] that her symptoms were not as severe" as alleged. R. 22. The ALJ may consider these factors in weighing the claimant's credibility. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994); *Viverette v. Astrue*, No. 5:07cv395-FL, 2008 WL 5087419, at *2 (E.D.N.C. Nov. 24, 2008). Kelly's mental health treatment during the relevant period consisted of daily or weekly life-skills training/counseling sessions and three visits to Dr. Trost's clinic for medication management. "In some cases counseling and medication management may be aggressive treatment for mental impairments, but in this case, the ALJ's determination that [Kelly's] treatment was conservative is reasonable." *Smith v. Comm'r of Soc. Sec.*, No. 4:13cv61, slip op. at 11 (W.D. Va. Oct. 14, 2014) (Hoppe, M.J.),

*adopted by* 2014 WL 5622840, at *1 (Nov. 4, 2014) (Kiser, J.). On this record, I cannot find that the ALJ's credibility determination was unreasonable, lacked an adequate basis, or conflicted with other findings of fact.

C.     *Mental RFC*

Kelly also argues that the ALJ impermissibly crafted his own mental RFC that conflicted with each relevant medical-source opinion in her record. *See* Pl. Br. 11. A claimant's RFC is the most she can do on a regular and continuing basis despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). "It is an administrative assessment made by the Commissioner based on all the relevant evidence in the [claimant's] record," including objective medical evidence, medical-source opinions, and the claimant's own statements. *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011); *accord* SSR 96-8p, 1996 WL 374184 (July 2, 1996). As long as the record is otherwise adequate, the ALJ is not required to obtain a medical-source opinion addressing the claimant's RFC. *See Felton-Miller*, 459 F. App'x at 230–31.

The RFC must reflect the combined limiting effects of impairments "supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints." *Carter v. Astrue*, No. 3:10cv510, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011), *adopted by* 2011 WL 2693392 (July 11, 2011); *accord* 20 C.F.R. §§ 404.1545(e), 416.945(e). Although this Court reviews the RFC determination for substantial evidence, the claimant bears the burden of showing that an omitted limitation should have been included. *See Lowery v. Comm'r of Soc. Sec.*, No. 4:10cv47, 2011 WL 2648470, at *4 (W.D. Va. June 29, 2011) (Crigler, M.J.) ("The claimant's RFC is addressed at the fourth step in the sequential evaluation, where the burden of proof remains on the claimant."), *adopted by* 2011 WL 2836251 (July 14, 2011) (Kiser, J.).

For Kelly's RFC, the ALJ restricted her to "simple, unskilled work" requiring only "occasional contact with the general public." R. 17. The RFC also expressly contemplates that Kelly can understand, remember, and execute simple instructions; make simple work-related decisions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. *Id.*

The ALJ does not fully explain why he included these restrictions in Kelly's RFC. *See* R. 23. Nonetheless, it is clear that he considered all of the relevant medical and other evidence when assessing Kelly's RFC, as the regulations required him to do. *See* R. 18–23; *Johnson v. Astrue*, No. 6:11cv9, 2012 WL 2046939, at *3 (W.D. Va. June 5, 2012); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Contrary to Kelly's argument, Pl. Br. 11, 16–17, this is not a case where the ALJ, "[i]n the absence of any psychiatric or psychological evidence to support his position," impermissibly substituted his judgment for that of two mental health professionals. *See Fields v. Astrue*, No. 2:09cv24, 2010 WL 723690, at *26 (W.D. Va. Feb. 26, 2010) (quoting *Grimmet v. Heckler*, 607 F. Supp. 502, 503 (S.D. W.Va. 1985)). Further, the "record provides an adequate explanation of the Commissioner's decision" for this Court to determine whether substantial evidence supports the ALJ's underlying factual findings, including his RFC determination. *Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011) (brackets omitted); *accord Bishop*, 583 F. App'x at 67 ("[I]f the decision 'is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.'" (quoting *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)).

As discussed above, Dr. Trost and Nurse Jones conducted mental status exams that, for the most part, showed Kelly functioned within normal limits. In January 2012, Dr. Trost observed that Kelly followed their hour-long conversation and answered questions with minimal

difficulty. *See* R. 377–78. In March, Nurse Jones noted that Kelly's "memory and attention[] span" were normal, her speech was spontaneous, "soft, relevant, and coherent," her judgment and insight were "intact," and her "attitude [was] appropriate, pleasant, and cooperative." R. 375. Progress notes show that Kelly's social skills were deficient at times during the relevant period. *See, e.g.*, R. 378, 539, 542, 547–48, 552, 558.  The ALJ discussed this evidence in forming Kelly's RFC, *see* R. 19–21, and Kelly does not point to any objective medical or other credited evidence that the ALJ inexplicably omitted from her RFC.

The ALJ, however, did not explain how "simple, unskilled work" reflects his finding at step three that Kelly had "moderate difficulty" maintaining concentration, persistence, and pace. R. 16. He attributed this limitation to Kelly's report that her impaired vision caused "problems with concentration, completing tasks, memory, understanding, and following instructions." *Id.* (citing R. 246). Later in his decision, the ALJ rejected Kelly's testimony to the extent that it was inconsistent with an RFC for simple, unskilled work. *See* R. 22. Although the grounds for the ALJ's credibility and RFC determinations are adequately supported by the record, the ALJ's findings at steps three and four are inconsistent.

A restriction to simple, unskilled work does not necessarily include moderate limitation in concentration, persistence, and pace. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011); *Sexton v. Colvin*, 21 F. Supp. 3d 639, 642–43 (W.D. Va. 2014) (Conrad, C.J.) (reversing and remanding where hypothetical question did not expressly address that claimant's RFC included moderate difficulty maintaining concentration, persistence, or pace). Unskilled work "is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher*, 181 F. App'x at 364 n.3 (quoting 20 C.F.R. § 404.1568(a)). The term itself tells us little, if anything, about the

24

person's "mental condition or abilities," let alone her ability to concentrate on or persist in a task or to maintain the pace required to complete tasks in a competitive work environment. *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008); *see also Sexton*, 21 F. Supp. 3d at 642–43. The ALJ erred by finding, at step three, that Kelly had moderate limitation in concentration, persistence, and pace, and then failing to explain why he did not include this same limitation in Kelly's RFC at step four. *See Winschel*, 631 F.3d at 1180.

This error was of the ALJ's own making. His step three finding of moderate limitation was based solely on Kelly's subjective complaints, *see* R. 16, which, at step four, he reasonably determined were less than credible. These inconsistent findings, however, do not otherwise negate the substantial evidence in the record that supports the RFC finding. Thus, this error is harmless and does not warrant remand.

The ALJ thoroughly discussed the evidence that supports his RFC determination. Furthermore, he gave specific reasons, supported by substantial evidence, for discrediting Dr. Trost's opinions, Ms. Arnold's opinions, and Kelly's subjective statements. Kelly's RFC for simple, unskilled work is consistent with the law and supported by substantial evidence in the record.

D.      *Reliance on the Grids*

Finally, Kelly argues that the ALJ should have consulted a vocational expert ("VE") rather than relying on the grids to decide her case. *See* Pl. Br. 20–22. Once the ALJ found that Kelly could not perform her past relevant work, R. 23, the burden shifted to the Commissioner to prove that Kelly could perform other work in the economy. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). The Commissioner can meet this burden by calling a VE to testify or,

in "appropriate cases," by relying on the grids to direct a finding of "not disabled." *Heckler v. Campbell*, 461 U.S. 458, 470 (1983).

The grids are published tables that take administrative notice of the number of unskilled jobs at each exertional level in the national economy. *See* 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a); *Davis v. Colvin*, No. 4:13cv35, slip op. at 23 (W.D. Va. July 14. 2014) (Hoppe, M.J.), *adopted by* 2014 WL 3890495 (Aug. 7, 2014) (Kiser, J.). The grids take into account only the exertional, or strength, competent of the applicant's RFC. *See Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *Davis*, 2014 WL 3890495, at *14. Thus, the Commissioner generally cannot rely on the grids alone when the applicant's "nonexertional limitation[]" reduces her ability "to perform work of which [s]he is exertionally capable." *Walker*, 889 F.2d at 49. In those cases, the Commissioner must consult a VE to prove that the applicant can perform specific jobs. *Id.*

"[N]ot every malady of a nonexertional nature rises to the level of a nonexertional impairment," however. *Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984) (per curiam). Thus, the Commissioner can use the grids as a "framework" if the applicant's nonexertional limitation "does not 'affect' [her] ability to perform the full range of work of which . . . she is physically capable." *Davis*, 2014 WL 3890495, at *14 (citing *Smith*, 719 F.2d at 725). The ALJ's finding that a limitation does not affect the applicant's ability to perform a full range of unskilled work at a given exertional level must be supported by substantial evidence. *See id.* (citing *Smith*, 719 F.2d at 725); *Hairston v. Astrue*, No. 6:11cv57, 2013 WL 5151036, at *7 (W.D. Va. Sept. 13, 2013).

The ALJ found that Kelly's ability to work "has been compromised by nonexertional limitations," but that these "limitations have little or no effect on the occupational base of unskilled work at all exertional levels." R. 24. Although the ALJ did not identify those

Case 4:13-cv-00070-JLK-JCH   Document 14   Filed 01/05/15   Page 26 of 28   Pageid#: 657

"nonexertional limitations," courts in this District and elsewhere have upheld grid determinations for applicants who, like Kelly, were limited to simple, unskilled work requiring only occasional interaction with the public. *See*, *e.g.*, *Stonestreet v. Astrue*, No. 5:12cv111, slip op. at 13–15 (W.D. Va. Feb. 18, 2014) (Ballou, M.J.), *adopted by* 2014 WL 992098 (Mar. 14, 2014) (Urbanski, J.); *Simpson v. Colvin*, No. 3:13cv250, 2014 WL 806121, at *3, *6–8 (E.D. Va. Feb. 28, 2014).

This disposition is appropriate when substantial evidence supports the ALJ's finding that a claimant with those limitations still can meet the specific "intellectual and emotional demands of at least unskilled, competitive remunerative work on a sustained basis." *Compare Stonestreet*, 2014 WL 992098, at *4, *8–9, *with Davis*, 2014 WL 3890495, at *14 (recommending reversal and remand); *accord* SSR 96-9p, 1996 WL 374185, at *9 (July 2, 1996) (encouraging ALJs to consult a VE when "an individual has been found to have a limited ability in one or more of the basic work activities" generally required by competitive, remunerative, unskilled work). As a policy statement explains, unskilled jobs primarily involve dealing with objects, rather than people or data. SSR 85-15 at *4; *accord Simpson*, 2014 WL 806121, at *3. Limitations like those identified in Kelly's RFC do not significantly erode the unskilled job base for all exertional levels. *See Simpson*, 2014 WL 806121, at *3. Thus, use of the grids is appropriate in Kelly's case. *See Stonestreet*, 2014 WL 992098, at *8–9; SSR 96-9p, at *9.

### IV. Conclusion

This Court must affirm the Commissioner's final decision that Kelly is not disabled if that decision is consistent with the law and supported by substantial evidence in the record. Both requirements were met here. Accordingly, I recommend that the Court **DENY** Kelly's motion for

27

summary judgment, ECF No. 10, **GRANT** the Commissioner's motion for summary judgment, ECF No. 12, and **DISMISS** this case from the docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: January 5, 2015

Joel C. Hoppe
United States Magistrate Judge